IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ARTHUR ROUSSEAU, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case. No: 2:20-cv-391-RAH-SMD |
| ) | [WO] |
| ALABAMA COMMUNITY ) | |
| COLLEGE SYSTEM, ) | |
| ) | |
| Defendant. ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This is an employment discrimination case. The Plaintiff, Arthur Rousseau ("Rousseau"), claims that the Defendant, the Alabama Community College System ("ACCS"), discriminated against him on the basis of his race and gender in violation of Title VII, 42 U.S.C. § 2000(e) et seq., ("Title VII"), when he was reassigned to a different position within ACCS and later terminated.

Before the court is a motion for summary judgment ("motion") filed by ACCS. (Doc. 13.) Rousseau has filed a response (Doc. 14), and ACCS a reply (Doc. 16), and the motion is therefore ripe for resolution. Upon consideration and for the reasons that follow, the motion is due to be granted.

**I.     BACKGROUND**

Rousseau is a white male. (Doc. 15-1 at 6.) In February of 2016, Rousseau was hired by ACCS as a temporary Assistant Director of Career and Technical Education ("CTE"). (*Id*. at 12–13.) He became the permanent Assistant Director in January of 2017 and was

1

later promoted to Director in May 2017. (*Id.* at 15, 17–18.)  In August 2019, he was reassigned to the newly created Workforce Solutions Department and given the title of Workforce Initiatives and Solutions Liaison. (Doc. 15-1 at 38, 41; Doc. 15-6 at 2.)  He was terminated in November 2019.  (Doc. 16-6 at 19.)

The parties' disputes began in January of 2018 when Rousseau organized a meeting with SkillsUSA, a skills training organization, and proposed a program providing professional development for ACCS instructors. (Doc. 15-1 at 23–24.) As a result of this meeting, SkillsUSA drafted and provided a memorandum of understanding ("MOU") for a services agreement between ACCS and SkillsUSA. (*Id.* at 24.)  This is where Rousseau, at least according to ACCS, began running into trouble.

As a part of developing the MOU, Rousseau worked with Sara Calhoun, Executive Director of the Fiscal Division, and David O'Brien, Senior Associate Counsel in the Legal Division. (Doc. 15-1 at 25; Doc. 15-2 at 6.) Calhoun and O'Brien were consulted because, as Rousseau acknowledges, ACCS's policy and practice required that all contracts be approved and signed by the Chancellor, or his designee, after being reviewed and approved by the Legal and Fiscal Divisions at ACCS. (Doc. 13-8 at 20; Doc. 15-1 at 24, 26–27.)

Back and forth edits were made between ACCS and SkillsUSA from March 2018 to January 2019.  (Doc. 13-4 at 26–32, 38-48; Doc. 15-1 at 25.)  Eventually, a finalized MOU was approved by Calhoun and O'Brien, (Doc. 15-1 at 29), and signed by the Chancellor on February 20, 2019, (Doc. 13-3 at 39–46; Doc. 15-1 at 29).  Rousseau then emailed the signed MOU to SkillsUSA for execution. (Doc. 13-5 at 11.)

On March 1, 2019, SkillsUSA returned the signed MOU with a number of handwritten modifications. (Doc. 13-5 at 3-10, 15–16.) According to Rousseau, he discussed the changes with Calhoun, who told him the changes were minor, "no big deal," and did not require the Chancellor's signature. (Doc. 13-5 at 21; Doc. 15-1 at 30.)

Relying on his conversation with Calhoun, Rousseau did not discuss or share the modified MOU with O'Brien or the Chancellor, and therefore the modified MOU was never approved by the Legal Division or the Chancellor. (Doc. 15-1 at 31.) SkillsUSA nevertheless was permitted to proceed under the modified MOU. (Doc. 15-1 at 32.)

In July, SkillsUSA sought payment for its services, and according to Calhoun, in August, she first learned about the modified MOU when Rousseau brought the payment request to her attention. (Doc. 15-2 at 13; Doc. 15-6 at 3.) Calhoun told Rousseau that she would have to check with the Legal Division to determine what options existed since the changes had not been approved by the Chancellor. (*Id.*)

Once alerted by Calhoun, O'Brien with the Legal Division discussed the modified MOU with Rousseau, (Doc. 15-1 at 43), and then with the Chancellor, (Doc. 13-13 at 3). According to the Chancellor, he believed that Rousseau's conduct was inexcusable in allowing SkillsUSA to proceed under the unapproved modified MOU, and therefore he decided to terminate Rousseau's employment. (*Id.*)

On October 7, 2019, ACCS presented Rousseau with a letter informing him that he was being placed on administrative leave through November 29, 2019, after which time he was to be terminated. (Doc. 15-6 at 19.) The letter did not state a precise reason for the

3

termination, other than that Rousseau was an "at-will employee" and served "at the pleasure of the Chancellor." (*Id*.) The letter took Rousseau by surprise. (Doc. 15-1 at 20.)

On December 10, 2019, Rousseau filed a charge of discrimination. (Doc. 15-5.) Rousseau believed that his termination was because of his race and gender, and that ACCS's discriminatory actions began in August 2019 when he was replaced as Director of CTE by Natalie English, an African American female, and was reassigned to the Workforce Initiatives and Solutions position. (Docs. 15-1 at 38, 41; 15-6 at 2.)

This position change was troubling to Rousseau because he had previously overheard English discussing his employment status with other African American employees. (Doc. 15-1 at 42.) Among others, Rousseau heard "whispers" that he was going to be terminated, including a statement from English saying, "Art's about to go." (*Id*. at 38.)

This whisper campaign coincided with his observation that Vice Chancellor Susan Price, an African American female, began to "nitpick" Rousseau's work. (Doc. 15-1 at 45.) According to Rousseau, the nitpicking seemed to be a result of English's more frequent interactions with Price on initiatives involving historically black colleges and universities that ACCS supported. (*Id*.)

## II.  STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Rule 56 [ ] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. If the movant meets this threshold, the nonmoving party must "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (citation and internal quotation marks omitted).

On summary judgment, a court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994). Any factual disputes will thus be resolved in the non-movant's favor, but only when sufficient competent evidence supports the non-moving party's version of the disputed facts. *Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).

A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, that party must present "affirmative evidence" of material factual conflicts

to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. If the non-movant's response relies on nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See, e.g., Holifield v. Reno*, 115 F.3d 1555, 1565 n.6 (11th Cir. 1997); *Harris v. Ostrout*, 65 F.3d 912 (11th Cir. 1995).

### III. ANALYSIS

In his Complaint, Rousseau alleges that ACCS reassigned and later terminated him based on his race and gender in violation of Title VII. ACCS has moved for summary judgment on both claims.

To establish a prima facie case of discrimination under Title VII, Rousseau must show that ACCS acted with discriminatory intent. *Hill v. MARTA*, 841 F.2d 1533, 1538 (11th Cir. 1988). To establish a prima facie case of discrimination using circumstantial evidence, which is the only type of evidence that Rousseau attempts to present, Rousseau must show: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was replaced by a person outside his protected class or a similarly situated employee outside that class was treated more favorably; and (4) he was qualified to perform his job. *See Holifield*, 115 F.3d at 1562.[1]

Next, if Rousseau establishes a prima facie case of discrimination, the burden of production shifts to ACCS to articulate a legitimate nondiscriminatory reason for its employment action. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

---

[1] Here, there is no dispute that Rousseau is a member of a protected class and was qualified to perform his job. The parties do dispute whether Rousseau's reassignment was a qualifying adverse employment action (at least as to his race discrimination claim), and whether he was treated less favorably than individuals outside of his protected class.

Rousseau can, in turn, demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id*. at 256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

### A. Rousseau's Reassignment in Position

Rousseau complains of two adverse employment actions as to his discrimination claims.[2] Besides his termination (which is the quintessential adverse employment action), Rousseau also claims that his reassignment from the position of CTE Director to Workforce Liaison constituted an adverse employment action. ACCS challenges the reassignment as an actionable adverse employment action, but not the termination.

To demonstrate an adverse employment action, a plaintiff must show that the complained-of action "in some substantial way alter[ed] the employee's compensation, terms, conditions, or privileges of employment, deprive[d] him or her of employment opportunities, or adversely affect[ed] his or her status as an employee." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). That is, there must have been a serious and material change in the plaintiff's employment status "such as . . . reassignment with

---

[2] While Rousseau claimed in his Complaint that his reassignment was also based on his gender, he did not address the gender-discrimination claim in response to ACCS's summary judgment motion. Accordingly, he has effectively abandoned the claim. *See Hamilton v. Southland Christian Sch., Inc*., 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.").

significantly different responsibilities, or a decision causing a significant change in benefits." *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1239 (11th Cir. 2001), *overruled on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006).

A purely lateral transfer—a transfer that does not involve a demotion in form or substance—does not rise to the level of an adverse employment action. *Hinson v. Clinch Cty., Georgia Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000); *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998). A plaintiff must offer evidence of a difference in wages, benefits, rank, or prestige to demonstrate that a lateral transfer is a serious and material change. *Jefferson v. Sewon Am., Inc*., 891 F.3d 911, 921 (11th Cir. 2018).

Here, Rousseau fails to demonstrate that his reassignment to the position of Workforce Liaison was an adverse employment action. He does not argue that his reassignment resulted in a loss in pay or benefits. (*See* Doc. 15-1 at 41.) And he also does not argue that he was given fewer responsibilities or made to perform more menial tasks. *See McCabe v. Sharrett*, 12 F.3d 1558, 1564 (11th Cir. 1994).

Rather, he argues that his reassignment resulted in a shift of some of his job duties, placed him in a position with lower job qualifications, and listed him differently in the online staff directory that, in his opinion, could have created the perception of a demotion. (*See* Doc. 15 at 28-32.) But this does not constitute a substantial and material alteration in the terms and conditions of employment. And any perception of a demotion is subjective, conjectural, and without tangible harm. S*ee Kidd v. Mando American Corp.,* 731 F.3d 1196, 1203-04 (11th Cir. 2013) (work reassignments resulting in "a loss of supervisory responsibility," but not a loss of pay or benefits, generally does not constitute an adverse

employment action); *Mitchell v. University of North Alabama*, 785 F. App'x 730, 736 (11th Cir. 2019) (concluding that reassignment in positions did not constitute an actionable harm).

That Rousseau may have felt a subjective blow to his professional image, or suffered a subjective loss of perceived prestige, is not enough, standing alone, to demonstrate that he suffered an adverse employment action. After all, the federal judiciary does not sit as a super-personnel department that reexamines an entity's business decisions. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). "[I]t is important not to make a federal case out of a transfer that is de minimis, causing no objective harm and reflecting a mere chip-on-the-shoulder complaint." *Hawkins v. BBVA Compass Bancshares, Inc.*, 613 F. App'x 831, 836 (11th Cir. 2015) (citing *Doe*, 145 F.3d at 1453 & n. 21 (11th Cir. 1998)).

Without more, Rousseau cannot demonstrate that his reassignment constituted an actionable adverse employment action. Accordingly, ACCS is entitled to summary judgment on his discrimination claims relating to his August job reassignment.

**B. Rousseau's Termination**

1. Rousseau's Prima Facie Case

Rousseau also brings a claim for discrimination based on his termination. ACCS argues that it is entitled to summary judgment because Rousseau cannot show he was treated less favorably than a comparator or alternatively that he was replaced by a female. Rousseau does not argue that he was replaced by someone of a different class. Instead, he offers Sara Calhoun as his comparator since, according to Rousseau, Calhoun told Rousseau that the modified MOU need not be reviewed by the Legal Division or signed by

9

the Chancellor, yet Calhoun was not disciplined, unlike Rousseau who was terminated for a policy violation.

"To establish a prima facie case and raise a presumption of discrimination, the preferentially treated individual from outside the plaintiff's protected class . . . must be similarly situated to the plaintiff in all material respects." *Herron-Williams v. Alabama State Univ.*, 805 F. App'x 622, 628 (11th Cir. 2020) (citing *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc)). "Although what constitutes a 'material' similarity or difference will differ from case to case, a similarly situated comparator generally will have 'engaged in the same basic conduct (or misconduct) as the plaintiff;' 'been subject to the same employment policy, guideline, or rule as the plaintiff;' 'been under the jurisdiction of the same supervisor as the plaintiff;' and 'share[d] the plaintiff's employment or disciplinary history.'" *Id.* (quoting *Lewis*, 918 F.3d at 1227–28).

ACCS argues that Calhoun is not a proper comparator because she and Rousseau held altogether different job titles, worked in different divisions, had different supervisors,[3] and had different roles in the contract approval process at ACCS. (Doc. 13 at 26.) Rousseau does not challenge this argument; instead, he counters that if the circumstances concerning the modified MOU constituted a policy violation, then both he and Calhoun violated it, yet he was disciplined while she was not. (Doc. 15 at 15.)

Rousseau's proffer of Calhoun as a comparator essentially hinges on this piece of dicta from *Lewis*:

---

[3] ACCS notes in its brief that there is no evidence that Rousseau and Calhoun had the same supervisor, (Doc. 13 at 26 n.12), a point which Rousseau does not dispute.

10

> As the City acknowledged in response to questioning at oral argument, for instance, an African-American female who gets fired because she routinely arrives to work an hour late *could surely point, as a valid comparator, to a white male who routinely shoves off an hour early*—at least absent some good reason (say, a regularly scheduled a.m. staff meeting) for concluding that morning absences are more detrimental to workplace efficiency or morale than those in the afternoon.

918 F.3d at 1228 n.13 (emphasis added). That is, Rousseau asserts that because Calhoun and Rousseau both engaged in the same or functionally identical misconduct (they both violated the same "work rule"), that demonstrates that they are proper comparators.

The problem with this point, if one assumes they both violated the same work rule, is that there is no evidence that the Chancellor, the operative decisionmaker in this case, was aware of Calhoun's involvement with the modified MOU. As has been noted, "[e]ven if another employee violated the same work rule as the plaintiff and was not punished for it, for the other employee to be deemed similarly situated to the plaintiff requires a showing that the employer was aware of the other employee's misconduct." *Prior v. Norfolk S. Corp.*, Case No. 2:17-CV-01870-JEO, 2019 WL 3429386, at *6 (N.D. Ala. July 30, 2019) (citing *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1317 n.5 (11th Cir. 2003)); *see Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (plaintiff's allegation that other comparators violated same work rule was "inapposite," absent any evidence that the employer "knew of such transgressions."); *Shockley v. HealthSouth Cent. Georgia Rehab. Hosp.*, 293 F. App'x 742, 745 (11th Cir. 2008) ("Evidence that other employees were guilty of similar misconduct but were not disciplined does not establish that an individual is similarly situated when the party taking the adverse action was unaware of the employees' misconduct.").

11

Without evidence that the Chancellor was aware of the same policy violation by Calhoun as it concerned the MOU, Rousseau's "work rule" argument does not satisfy his prima facie burden.

2. ACCS's Reason for Termination

ACCS is also due summary judgment for a different reason; namely, that even assuming Rousseau demonstrated a prima facie case, Rousseau still has failed to rebut ACCS's legitimate, nondiscriminatory reason for his termination: his violation of company policy through his failure to have the Legal Division review the modified MOU and to have the Chancellor execute it.

Violation of a company policy is a legitimate reason for a termination. *See Jenner v. Bank of Am. Corp.*, 304 F. App'x 857, 859 (11th Cir. 2009); *McCoy v. Geico Gen. Ins. Co.*, 510 F. Supp. 2d 739, 752 (M.D. Fla. 2007). Accordingly, ACCS has met its exceedingly light burden and therefore, the burden shifts back to Rousseau to show that ACCS's proffered reason is pretext for discrimination.

Here, Rousseau advances the "work rule" (or similar offense) as evidence of pretext; that is, ACCS treated another employee, Calhoun, who engaged in similar acts, more favorably. *See Jenner*, 304 F. App'x at 859. An employer's work rule defense "is arguably pretextual when a plaintiff submits evidence . . . [that] other employees outside the protected class, who engaged in similar acts, were not similarly treated." *Id.* (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999)). "To satisfy the similar offense prong, the comparator's misconduct must be nearly identical to the

plaintiff's . . . to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Id*. (quoting *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001)).

But here, Rousseau and Calhoun did not violate the same work rule or commit the same or similar offense. It was Rousseau who was obligated to obtain approvals from both the Finance and Legal Divisions and to obtain the Chancellor's signature, not Calhoun. (Doc. 15-1 at 26, 30.) *See Damon*, 196 F.3d at 1363 (valid comparator must have "engaged in similar acts); *Osram Sylvania, Inc. v. Teamsters Local Union 528*, 87 F.3d 1261, 1265 (11th Cir.1996) ("Disparate treatment exists when similarly situated workers are treated differently even though they have committed *similar* acts.") (emphasis added). Calhoun was simply one of several individuals with whom Rousseau was to consult and obtain an approval.

Furthermore, Rousseau's designee argument is also unpersuasive because it would not absolve Rousseau from a violation of ACCS's approval policy. If, as Rousseau argues, Calhoun could serve as the Chancellor's designee such that the Chancellor-approval obligation was satisfied with Calhoun's complicity, Rousseau still was obligated to obtain the Legal Division's approval which he did not do.

And even more, that presupposition thereby would eliminate Calhoun as a comparator. (*See* Doc. 15 at 24.) In that situation, Rousseau still would have violated policy by not having the Legal Division approve the modification but he would have no comparator to point to who committed the same or similar infraction without discipline.

13

*See Lewis,* 918 F.3d at 1228 (the plaintiff and the proffered comparator must be "sufficiently similar, in an objective sense, that they cannot reasonably be distinguished").

And finally, Rousseau still has not presented evidence that ACCS (through the Chancellor) did not honestly believe that Rousseau violated the organization's contract approval policy. *See Jenner*, 304 F. App'x at 860. The fact of the matter is that Rousseau violated the policy. Whether Calhoun also bears fault or blame for the policy violation or whether Rousseau has a legitimate excuse based on Calhoun's statements to him, does not make the Chancellor's decision a discriminatory one. At best, it makes the decision an unfair and harsh one. As courts have repeatedly stated, "[w]e are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon*, 196 F.3d at 1361.

Rousseau has the burden to show that ACCS's stated reason is false and that discrimination was the real reason for his termination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). Rousseau did not introduce such evidence, and without more, ACCS's motion for summary judgment as to Count II of the Complaint is due to be granted.

## IV.   CONCLUSION

For the foregoing reasons, it is

ORDERED:

(1) The Motion for Summary Judgment (Doc. 13) is GRANTED; and

(2) The Joint Motion to Suspend Pretrial Deadlines and Continue Trial until after Court Ruling on Pending Motion for Summary Judgment Motion (Doc. 18) is DENIED as moot.

A separate judgment will issue.

DONE, on this the 6th day of August, 2021.

/s/R. Austin Huffaker, Jr.
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE